# In the United States Court of Federal Claims

No. 18-359
Filed: December 31, 2025

---

|  |  |
|---|---|
| UTE INDIAN TRIBE OF THE UINTAH AND OURAY INDIAN RESERVATION, | ) ) ) ) |
| *Plaintiff,* | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| *Defendant.* | ) ) ) |

---

*Michael W. Holditch*, Patterson Real Bird & Wilson LLP, Louisville, CO, for Plaintiff. *Jeremy J. Patterson* and *Joanne Harmon Curry*, Patterson Real Bird & Wilson LLP, Louisville, CO, and *Benner Fenner*, Patterson Real Bird & Wilson LLP, Washington, DC, *of counsel*.

*Amanda K. Rudat*,[1] Trial Attorney, Natural Resources Section, U.S. Department of Justice, Washington, DC, for Defendant, with whom was *Adam R.F. Gustafson*, Acting Assistant Attorney General, Environment & Natural Resources Division.

## OPINION AND ORDER

The Ute Indian Tribe of the Uintah and Ouray Reservation brings this case under the Indian Tucker Act, alleging several breaches of fiduciary duties and contract claims relating to the United States' management of tribal water rights and irrigation infrastructure. After the court dismissed the complaint, the United States Court of Appeals for the Federal Circuit vacated-in-part and returned the case to this court for further proceedings. Following the remand, the plaintiff filed an amended complaint, which the Government has moved to dismiss in part for lack of subject-matter jurisdiction and for failure to state a claim. Because the court can hear some claims but not others, the court grants-in-part and denies-in-part this motion to dismiss.

## I.    Background

For many years, the United States has managed the irrigation infrastructure and the water rights as a fiduciary for the benefit of the Ute Indian Tribe of the Uintah and Ouray Reservation

---

[1] After oral argument, Samuel R. Vice replaced Ms. Rudat as the attorney of record for the United States.

(the "Tribe").  In short, the Tribe believes that the United States has breached its fiduciary duties to the Tribe to manage trust assets and water rights in several ways.  The United States contends that many of the alleged duties do not exist and those that do are limited by the court's statute of limitations or a prior settlement agreement.  Because the history of this dispute is presented in both this court's prior decision and the Federal Circuit's decision in this case, the court does not recount it all here.  Rather, the court presents the history relevant to this dispute.

### A.     The Uintah Indian Irrigation Project

All of the Tribe's claims involve the management of the Uintah Indian Irrigation Project ("UIIP"), which provides irrigation to the Uintah[2] and Ouray Indian Reservation (the "Reservation").  The Reservation consists of land from the Uintah Valley Reservation, established in the 1860s,[3] and the Uncompahgre Reservation, established in the 1880s.[4]  ECF No. 65 at 4–5, ¶ 8.[5]

Before turning to the UIIP infrastructure claims, the court recognizes that the United States District Court for the District of Utah determined that the Secretary of the Interior ("Secretary") holds certain water rights as trustee for the Tribe under the *Winters* doctrine.  *See Winters v. United States*, 207 U.S. 564 (1908).  These water rights have an 1861 priority date.[6] Decree ¶ 1, *United States v. Dry Gulch Irrigation Co.*, No. 4418 (D. Utah 1923); Decree ¶ 1, *United States v. Cedarview Irrigation Co.*, No. 4427 (D. Utah 1923); *see also Hackford v. Babbitt*, 14 F.3d 1457, 1461 (10th Cir. 1994); *see also* ECF No. 65 at 11–12, ¶¶ 34, 36–37.

### 1.     The 1906 Act.

In 1906, Congress appropriated funds "[f]or constructing irrigation systems to irrigate the allotted lands of the Uncompahgre, Uintah, and White River Utes in Utah."  Pub. L. No. 59-258, 34 Stat. 325, 375 (1906).  The 1906 Act provides that "such irrigation systems shall be constructed and completed and held and operated, and water therefor appropriated under the laws of the State of Utah, and the title thereto appropriated until otherwise provided by law shall be in

---

[2] As the Tribe notes, "'Uinta' is the proper spelling for natural features, whereas 'Uintah' is the spelling applied to political entities; however, the two spellings are often used interchangeably." ECF No. 65 at 5 n.1 (citation omitted).  The court uses the spelling "Uintah" throughout this Opinion and Order consistent with the Tribe's complaint.

[3] Executive Order (Oct. 3, 1861); Sale of Indian Reservations in Utah Territory, ch. 77, 13 Stat. 63 (May 5, 1864).

[4] Ute Indian Reservation Sale Act, ch. 223, 21 Stat. 199, 199–205 (June 15, 1880); Executive Order (Jan. 5, 1882).

[5] Because the paragraphs of the Tribe's complaint are not consecutively numbered, the court cites both the page number and paragraph number.

[6] The decrees also established an 1861 priority date for the water rights held by the United States and the owners by grant of reservation allotments.  Decree ¶ 1, *United States v. Dry Gulch Irrigation Co.*, No. 4418 (D. Utah 1923); Decree ¶ 1, *United States v. Cedarview Irrigation Co.*, No. 4427 (D. Utah 1923).

the Secretary of the Interior in trust for the Indians." *Id.* The 1906 Act permitted "the ditches and canals of such irrigation systems [to] be used, extended, or enlarged for the purpose of conveying water by any person, association, or corporation under and upon compliance with the provisions of the laws of the State of Utah." *Id.* The irrigation systems authorized by the 1906 Act are now known as the UIIP. ECF No. 65 at 9, ¶ 26.

### 2. The 1941 Act.

In 1941, Congress authorized the Secretary "to transfer water rights, with the consent of the interested parties, to other lands under [the UIIP] and to make necessary contracts to effectuate such transfers." Uintah Indian Irrigation Project Landowners Relief, Pub. L. No. 77-83, § 2, ch. 142, 55 Stat. 209 (1941). The Secretary has invoked the 1941 Act to make several water rights transfers. *See, e.g.*, ECF No. 73-2 at 41–43;[7] *id.* at 21–34; *see also* ECF No. 65 at 21, ¶ 82 ("The Secretary ultimately transferred Tribal water rights from about 10,000 acres of trust lands to other non-Indian lands . . . .").

### 3. The 1965 Deferral Agreement and the Central Utah Project Completion Act.

The next chapter in the history of the UIIP was the "1965 Deferral Agreement" made among the Tribe, the Government, and the Central Utah Water Conservancy District (a subdivision of the state of Utah). ECF No. 65 at 15, ¶ 50; ECF No. 72-6 at 2–8. That agreement "recognized" the use of the Tribe's water by the Government for the Central Utah project—a federal water project involving the Colorado River—and the Tribe deferred its water rights in that water until the completion of the Central Utah project or until January 1, 2005, whichever occurred first. ECF No. 72-6 at 5–6; *see also* ECF No. 65 at 15, ¶ 50. In exchange, the Government agreed to "construct additional storage" for the benefit of the Tribe. Pub. L. No. 102-575, § 501(a), 106 Stat. 4600, 4650–51 (1992) (describing the 1965 Deferral Agreement); ECF No. 72-6 at 7; *see also* ECF No. 65 at 15–16, ¶ 51. The Government did not construct that storage because it "was unable to find adequate and economically feasible" storage sites for part of the promised storage, and another part was "not authorized by Congress." Pub. L. No. 102-575, § 501(a)(3), 106 Stat. at 4651; *see also* ECF No. 65 at 16, ¶¶ 52–53.

The Government again appropriated funds to construct storage in the Central Utah Project Completion Act ("CUPCA") in 1992. Pub. L. No. 102-575, §§ 201, 203, 106 Stat. at 4612–14; *see* ECF No. 65 at 17, ¶¶ 55–56. CUPCA provided that the "authorization to construct" additional UIIP storage and infrastructure features would "expire if no federally appropriated funds for such features have been obligated or expended . . . [(1)] within five years from the date of completion of feasibility studies," (2) "such longer time as necessitated for [] completion" of environmental studies under the Endangered Species Act or the National Environmental Policy Act, or (3) "if the Secretary determines that such feature is not feasible." § 203(b), 106 Stat. at 4612. Congress also appropriated funds to settle with the Tribe any water rights claims stemming from the 1965 Deferral Agreement. § 507(b), 106 Stat. at 4655.

---

[7] Several of the parties' exhibits are not consecutively paginated. Accordingly, for those exhibits, the court cites the pagination in the CM/ECF header.

4.      The Midview Exchange Agreement.

In 1967, the Tribe entered the "Midview Exchange Agreement" with the United States, acting through the Bureau of Reclamation ("Reclamation") and the Bureau of Indian Affairs ("Indian Affairs"), and the Moon Lake Water Users Association ("Association").  ECF No. 72-5.  The Midview Exchange Agreement provided Reclamation would transfer to Indian Affairs "for the use and benefit of the Uintah Project the water and water rights in Duchesne River."  *Id.* ¶ 7.  Reclamation and the Association also agreed to transfer to Indian Affairs "the jurisdiction of the right, title and interest in and to the Midview Dam and Reservoir, Duchesne Diversion Dam, Duchesne Feeder Canal, and Midview Lateral together with all facilities and property appurtenant thereto."  *Id.* ¶ 8.  Indian Affairs would "as part of the Uintah Project operate and maintain such facilities."  *Id.*  The parties, and therefore the court, refer to these promised transferred rights as the "Midview Property."  *See* ECF No. 65 at 22–23, ¶ 87; ECF No. 72 at 19–20. The title to the transferred facilities "remain[ed] in the United States," and the agreement provided the "transferred works shall become part of the project works of the Uintah Project."  ECF No. 72-5 ¶ 8.  Indian Affairs received those rights in exchange for transferring "a specific portion of the water and water rights in Lake Fork River" to Reclamation "for the use and benefit of the Moon Lake Project."  *Id.* ¶ 6.  In signing, the Tribe acknowledged the agreement was "deemed to be to the best interest of the Ute Indian Tribe."  *Id.* at 9.

The promised transfer of the Midview Property occurred in 1968.  ECF No. 65 at 23–24, ¶¶ 91–92; ECF No. 73-1.  The 1968 Midview Property transfer agreement states that Reclamation and the Association "transfer to the Bureau of Indian Affairs the jurisdiction of the right, title, and interest in and to the" Midview Property.  ECF No. 73-1 ¶ 1.  In accepting the Midview Property, Indian Affairs promised to "operate and maintain said facilities . . . as part of the" UIIP.  *Id.* ¶ 2.  Indian Affairs also promises to enter a separate agreement to "grant to the Ute Tribe the exclusive management of the recreational and fish and wildlife uses at Midview Reservoir."  *Id.* ¶ 3.

5.      Carriage agreements and nonirrigable declarations.

Additionally, the Government has taken other actions affecting the UIIP.  The Government "has designated a substantial portion" of the Tribe's land "as either temporarily non-assessable . . . or permanently non-assessable."  ECF No. 65 at 19, ¶ 68.  By statute, the Secretary must declare lands "temporarily nonirrigable," and thus temporarily non-assessable, where the Secretary "finds that any such lands cannot be cultivated profitably due to a present lack of water supply, proper drainage facilities, or need of additional construction work."  25 U.S.C. § 389a.  Likewise, "[w]here the Secretary finds that any such lands are permanently nonirrigable," and thus permanently non-assessable, the Secretary may eliminate lands from an irrigation project "with the consent of the landowner."  *Id.* § 389b.  The Government also "frequently enters carriage agreements, under which the U.S. agrees to use UIIP infrastructure to deliver non-tribal water to non-Indian water users," without input from the Tribe.  ECF No. 65 at 25, ¶¶ 98, 100.  And Indian Affairs "regularly engages in what it terms 'informal operating practices' . . . [which] entail informal agreements allowing non-Indians to utilize UIIP water and infrastructure . . . without consulting the Tribe."  *Id.* at 25, ¶ 102.

**B.      Procedural History**

4

By 2006, the Tribe was unsatisfied with the Government's management of the UIIP, which led the Tribe to file an action in this court for the Government's alleged breaches of trust. *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. United States*, No. 06-866 L (Fed. Cl. filed Dec. 19, 2006). The parties reached a settlement agreement disposing of that case in 2012. Joint Stipulation of Dismissal with Prejudice, *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. United States*, No. 06-866 L (Fed. Cl. June 1, 2012), ECF No. 43; ECF No. 72-7.

In the 2012 Settlement Agreement, the Tribe agreed to a rather broad waiver of its claims in exchange for $125 million:

> [The Tribe] hereby waives, releases, and covenants not to sue in any administrative or judicial forum on any and all claims, causes of action, obligations, and/or liabilities of any kind or nature whatsoever, known or unknown, regardless of legal theory, for any damages or any equitable or specific relief, that are based on harms or violations occurring before [March 8, 2012] and that relate to the United States' management or accounting of [the Tribe's] trust funds or [the Tribe's] non-monetary trust assets or resources.

ECF No. 72-7 ¶ 4. There was, however, an exception to that otherwise broad waiver. Specifically, the agreement did not waive the Tribe's "water rights, whether adjudicated or unadjudicated; [the Tribe's] authority to use and protect such water rights; and [the Tribe's] claims for damages for loss of water resources allegedly caused by [the Government's] failure to establish, acquire, enforce or protect such water rights." *Id.* ¶ 6.b.

Yet the Tribe's dissatisfaction resurfaced, and, on March 7, 2018, the Tribe filed this action. ECF No. 1. The Tribe brought claims for breaches of trust and breaches of contract.[8] ECF No. 18. This court granted the Government's motion to dismiss the complaint under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). *See Ute Indian Tribe of the Uintah & Ouray Indian Rsrv. v. United States*, No. 18-359 L, 2021 WL 1602876 (Fed. Cl. Feb. 12, 2021).

The Tribe appealed to the Federal Circuit, which affirmed-in-part, vacated-in-part, and remanded the case to this court. *See Ute Indian Tribe of the Uintah & Ouray Indian Rsrv. v. United States*, 99 F.4th 1353 (Fed. Cir. 2024). The Federal Circuit reversed the dismissal of claims under the 1906 Act pertaining to water infrastructure.[9] *Id.* at 1366. In doing so, the

---

[8] The Tribe also brought claims under the Takings Clause of the Fifth Amendment. ECF No. 18. The Federal Circuit affirmed dismissal of those claims. *Ute Indian Tribe of the Uintah & Ouray Indian Rsrv. v. United States*, 99 F.4th 1353, 1372, 1374–75 (Fed. Cir. 2024).

[9] The Federal Circuit affirmed dismissal of the Tribe's breach of trust claims under a statute passed on March 1, 1899, ch. 324, 30 Stat. 924, 941, (the "1899 Act") because it held the 1899 Act did not impose trust duties on the Government. *Ute Indian Tribe*, 99 F.4th at 1365–66, 1375. Although the Tribe describes the 1899 Act as part of the history of its water rights, the Tribe does not bring claims under the 1899 Act in its operative complaint, so the court does not discuss the previously dismissed 1899 Act breach of trust claims at length here.

Federal Circuit did not decide "whether allowing third-party use is a breach of the [Government's] fiduciary duties (except to the extent that we hold that such third-party use is not inconsistent with the obligation to protect and preserve the property)." *Id.* at 1370.  Nor did the Federal Circuit decide whether the 1906 Act created trust duties for the Government to "protect and preserve water rights" and remanded those claims to this court to consider in the first instance.  *Id.*  The court noted, however, that it "perceive[d] a predicate, jurisdictional issue . . . whether claims . . . as for water rights would survive the time bar."  *Id.*  But it decided that the 1906 Act did not impose any trust duties to "secure additional water for the Tribe" or "construct the full scope of the project initially contemplated in the statute."  *Id.* at 1371.

The Federal Circuit affirmed the dismissal of all remaining claims except part of the Tribe's claim relating to the Midview Exchange Agreement.[10]  *Id.* at 1371–74.  The circuit affirmed the dismissal of a breach of contract claim under the Midview Exchange Agreement concerning infrastructure as barred by the 2012 Settlement Agreement.  *Id.* at 1373.  But the circuit vacated the dismissal of the breach of contract claim to the extent the Midview Exchange Agreement implicated water rights because the 2012 Settlement Agreement's water rights claims exception might apply.  *Id.*  It directed this court to consider three questions on remand: "(1) whether there are water rights under the Midview Exchange Agreement, (2) whether the complaint adequately pled a breach of contract with respect to water rights, and (3) whether the exception in the 2012 settlement applies."  *Id.* at 1373–74.

The Federal Circuit did not reach the Government's alternative grounds to affirm dismissal based on the statute of limitations or the 2012 Settlement Agreement.  *Id.* at 1375.  It instructed that this court should also consider those alternative grounds on remand.  *Id.*

## II.     Standard of Review

### A.     Subject-Matter Jurisdiction Under the Indian Tucker Act

"A challenge to the [c]ourt's subject-matter jurisdiction over all *or part of the claims* asserted in a complaint is properly raised by motion under Rule 12(b)(1)."  *Smith v. United States*, 158 Fed. Cl. 520, 524 (2022) (emphasis added).  When deciding a Rule 12(b)(1) motion, this court "accepts as true all uncontroverted factual allegations in the complaint, construing them in the light most favorable to the plaintiff."  *Fletcher v. United States*, 26 F.4th 1314, 1321 (Fed. Cir. 2022) (citing *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014)).  "The plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence."  *Id.* (citing *Hopi Tribe v. United States*, 782 F.3d 662, 666 (Fed. Cir. 2015)).  "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  RCFC 12(h)(3); *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868) ("Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law,

---

[10] The Federal Circuit affirmed dismissal of the Tribe's breach of contract claims under the 1965 Deferral Agreement.  *Ute Indian Tribe*, 99 F.4th at 1371–72, 1375.  The Tribe does not bring a breach of contract claim stemming from the 1965 Deferral Agreement in the operative complaint, so the court does not discuss that claim at length here.

and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

The Tucker Act grants this court jurisdiction to adjudicate "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  The Indian Tucker Act likewise grants this court jurisdiction over "Indian tribal claims that 'otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe.'"  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (quoting 28 U.S.C. § 1505).  "Neither the Tucker Act nor the Indian Tucker Act creates substantive rights; they are simply jurisdictional provisions that operate to waive sovereign immunity for claims premised on other sources of law . . . ."  *United States v. Navajo Nation* (*Navajo II*), 556 U.S. 287, 290 (2009) (citations omitted).  Thus, to establish this court's jurisdiction under the Indian Tucker Act, the Tribe must identify another source of law that gives rise to a money-mandating claim.  *United States v. Navajo Nation* (*Navajo I*), 537 U.S. 488, 503 (2003).

A law imposing a money-mandating fiduciary duty on the Government can establish this court's jurisdiction.  *See Navajo II*, 556 U.S. at 290–91.  Because of the "unique position of the Government as sovereign," the Government's trust duties turn on the applicable statutes or regulations rather than the common law.  *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 174 (2011).  The Government may establish only a "bare" trust with the Indian tribes.  *Id.*  But it assumes trust duties "only to the extent it expressly accepts those responsibilities by statute."  *Id.* at 177.

To determine whether the Government assumed money-mandating fiduciary duties, courts employ the two-step framework from *Navajo II*.  *Hopi Tribe*, 782 F.3d at 667.  At step one, the Tribe "must identify statutes or regulations that both impose a specific obligation on the United States and 'bear[ ] the hallmarks of a conventional fiduciary relationship.'"  *Id.* (quoting *Navajo II*, 556 U.S. at 301).  And the Tribe must "allege that the Government has failed faithfully to perform those duties."  *Navajo II*, 556 U.S. at 290 (quoting *Navajo I*, 537 U.S. at 506).  A law creating a "general trust relationship" between the Government and the Tribe "is not enough to establish any particular trust duty."  *Hopi Tribe*, 782 F.3d at 667.  Likewise, the Government's "control" over the trust corpus cannot be the sole basis of its liability.  *Navajo II*, 556 U.S. at 301.  Step one looks for "specific rights-creating or duty-imposing statutory or regulatory prescriptions."  *Navajo I*, 537 U.S. at 506.  Beyond the specific duties, a law may impose inferred trust duties "that are necessary to comply with the specific statutory or regulatory duty."  *Confederated Tribes of the Colville Rsrv. v. United States*, 171 Fed. Cl. 622, 631 (2024) (citing *Hopi Tribe*, 782 F.3d at 668).  Additionally, the law may impose inferred trust duties to protect and preserve the trust corpus "where the fiduciary relationship goes beyond a bare trust and bears the hallmarks of a more conventional fiduciary relationship."  *Id.* (first citing *Ute Indian Tribe*, 99 F.4th at 1368; and then citing *White Mountain Apache Tribe*, 537 U.S. at 475).

If the Tribe identifies a sufficient trust relationship, it moves to *Navajo II* step two, where the Tribe must demonstrate the "source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties'" imposed on the

Government. *Navajo II*, 556 U.S. at 291 (quoting *Navajo I*, 537 at 506). The law is money-mandating if "either (1) 'it can fairly be interpreted as mandating compensation by the Federal Government' . . . or (2) 'it grants the [Tribe] a right to recover damages either expressly or by implication.'" *Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313, 1317 (Fed. Cir. 2017) (quoting *Blueport Co. v. United States*, 533 F.3d 1374, 1383 (Fed. Cir. 2008)); *see Navajo I*, 537 U.S. at 506 (explaining a law "need not . . . expressly provide for money damages; the availability of such damages may be inferred."). In lieu of express money-mandating language, "common-law trust principles . . . could play a role in 'inferring that the trust obligation [is] enforceable by damages.'" *Hopi Tribe*, 782 F.3d at 668 (quoting *Navajo II*, 556 U.S. at 301). "[W]hen a statute establishes specific fiduciary obligations, it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties. It is well established that a trustee is accountable in damages for breaches of trust.'" *Id.* (quoting *United States v. Mitchell*, 463 U.S. 206, 226 (1983)).

### B.    Failure to State a Claim

When deciding a Rule 12(b)(6) motion to dismiss, "the court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the" plaintiff. *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1365 (Fed. Cir. 2013) (citing *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)). Viewing the complaint through this lens, "[t]he facts as alleged 'must be enough to raise a right to relief above the speculative level.'" *Kam-Almaz v. United States*, 682 F.3d 1364, 1367–68 (Fed. Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (citing *Twombly*, 550 U.S. at 570). This court "may properly grant a motion to dismiss under RCFC 12(b)(6) when a complaint does not allege facts that show the plaintiff is entitled to the legal remedy sought." *Steffen v. United States*, 995 F.3d 1377, 1379 (Fed. Cir. 2021) (citing *Lindsay*, 295 F.3d at 1257).

## III.    Discussion

On remand, the Tribe brings three claims: (1) breach of trust by deficient operation, maintenance, oversight, and administration of the UIIP; (2) breach of trust by repudiation of trust responsibility and the trust status of the UIIP; and (3) breach of contract stemming from the Midview Exchange Agreement. ECF No. 65 at 26–30, ¶¶ 1–22. The Government moves to partially dismiss much of Tribe's claims under Rules 12(b)(1) and 12(b)(6). ECF No. 72.

### A.    The Tribe's first breach of trust claim survives to the extent it alleges the Government failed to maintain UIIP infrastructure and implement existing water quality measures.

The Tribe alleges the United States breached its fiduciary duties under the 1906 Act, including its "duties of prudence and care, the duty to protect trust corpus, and the duty not to allow trust corpus to fall into disrepair on the trustee's watch." ECF No. 65 at 27, ¶ 5. The Tribe also lists five examples of the Government's breaches of its fiduciary duties under the 1906 Act. *Id.* at 26–27, ¶ 4. The Government moves for partial dismissal of this claim. ECF No. 72 at 12,

14.  The Government separately addresses the grounds for dismissal of each of the five alleged breaches of trust listed under the Tribe's first claim.  *Id.* at 12–23.

Before turning to the merits of the dispute, the court must resolve a methodological dispute.  The Tribe argues the Government misconstrues its complaint to assert sub-claims and asks the court to review its first claim in whole.  ECF No. 73 at 11, 13–15.  In the Tribe's view, the court has jurisdiction over the entirety of the first claim because the Federal Circuit decided the "1906 Act created an enforceable, money-mandating fiduciary duty to hold and manage the UIIP for the benefit of the Tribe" and "used broad terminology to define this trust duty."  *Id.* at 13–14.  Thus, the Tribe contends that the Government's arguments for dismissal under Rule 12(b)(1) must fail.  *Id.* at 14.

The Federal Circuit explained that the 1906 Act "bears the 'hallmarks of a more conventional fiduciary relationship'" and expressly describes the UIIP irrigation system in defining this duty.  *Ute Indian Tribe*, 99 F.4th at 1368 (quoting *White Mountain Apache*, 537 U.S. at 473).  The Act also includes "express fiduciary language with an intended beneficiary— the [UIIP] is to be held 'in trust for the Indians.'"  *Id.* (quoting 34 Stat. at 375).  And its "'held and operated' language prescribes specific duties" for the Government as trustee.  *Id.* (quoting 34 Stat. at 375).  Given that the 1906 Act creates a "more conventional fiduciary relationship," the Federal Circuit decided that it created fiduciary duties "to protect and preserve the property."  *Id.* Thus, the Federal Circuit specifically recognized that the 1906 Act created money-mandating fiduciary duties to hold, operate, protect, and preserve the UIIP.  *Id.* at 1369.

But the Federal Circuit did not conclude that the Government's duties under the 1906 Act are boundless.  It specifically rejected the Tribe's arguments that the Act imposed (1) a duty to "secure additional water for the Tribe," or (2) any duty to "construct[]" or "complete[]" the UIIP.  *Id.* at 1371 (quoting 34 Stat. at 375).  "The 1906 Act does not itself create a trust duty to construct the full scope of the project initially contemplated in the statute."  *Id.*  This is because the trustee is not generally required to add to the corpus of a trust.  *See id.* (citing Restatement (Third) of Trusts § 88 cmt. a (2007)).

Thus, the Federal Circuit decided the 1906 Act imposes fiduciary duties to hold, operate, preserve, and protect the UIIP, but it did not impose duties to secure additional water for the Tribe, construct the entire UIIP, or complete the UIIP.  To be clear, the Tribe's complaint must identify the *specific* duties imposed on the Government by the 1906 Act the specific duties the Government has allegedly breached.  *See Navajo I*, 537 U.S. at 506; ECF No. 76 at 2.  Therefore, this court's task under the *Navajo II* framework is to assess whether the Tribe's breach of trust claim under the 1906 Act identifies the specific, money-mandating fiduciary duties recognized by the Federal Circuit and the Government's corresponding breaches of those duties.

The Tribe errs in arguing that the Government cannot seek to dismiss its claims for lack of jurisdiction under Rule 12(b)(1).  *See* ECF No. 73 at 13–14.  According to the Tribe, once the court identifies that a fiduciary duty exists, then any question as to the duty's scope are properly resolved under Rule 12(b)(6) on the merits.  *Id.* at 14.  But if the complaint did not identify *specific* fiduciary duties and plead their corresponding breaches, the Tribe would fail to establish this court's jurisdiction under *Navajo II*.

And there is another problem.  The question of fiduciary duties is generally one of statutory interpretation, meaning that dismissal under Rule 12(b)(6) would also be appropriate if the Tribe fails to establish the specific duties that it alleges were violated.  Because the outcome would be the same either way, the Tribe's argument fails to provide a reason to deny the Government's motion to dismiss.  The court thus assesses its jurisdiction over each specific alleged breach of the Government's fiduciary duties in the first claim.

1.    The mandate rule bars the Tribe from alleging a breach of trust claim based on the Government's failure to establish storage for the UIIP.

In Claim 1, the Tribe alleges the Government breached its fiduciary duties by failing "to establish the UIIP as a complete and fully functional irrigation system by providing storage infrastructure as part of the UIIP irrigation system." ECF No. 65 at 27, ¶ 4(a).  The court refers to this part of the first claim as the Tribe's "storage claim."  In support of this claim, the Tribe alleges "the Tribe's federal trustee has never supplied the Tribe with storage infrastructure and has never taken any meaningful action to facilitate Tribal access to water storage." *Id.* at 15, ¶ 46.  Thus, "the Tribe remains without access to storage for UIIP water rights to this day." *Id.*; *see also id.* at 17, ¶ 58 ("[T]he Tribe has no storage facility and related water works from which to supply its Indian Reserved Water Rights to its irrigable trust lands.").  And the Tribe alleges the Government "has exploited the Tribe's storage needs to advance its own agenda." *Id.* at 15, ¶ 49.  To exemplify that alleged exploitation, the Tribe points to the Government's failure to provide storage facilities under either the 1965 Deferral Agreement or CUPCA.  *Id.* at 15–17, ¶¶ 50–53, 55–57.  The lack of storage and other promised irrigation infrastructure allegedly caused "immense economic harm, including . . . lost crop yields . . . and lost economic opportunities." *Id.* at 17, ¶ 59.

The Federal Circuit already addressed this claim, and this court cannot reconsider "issues implicitly or explicitly decided on appeal." *TecSec, Inc. v. Int'l Bus. Machs. Corp.*, 731 F.3d 1336, 1341–42 (Fed. Cir. 2013) (quoting *Amado v. Microsoft Corp.*, 517 F.3d 1353, 1364 (Fed. Cir. 2008)).  Issues "explicitly reserved or remanded by the court" are not within the scope of the mandate rule.  *Engel Indus., Inc. v. Lockformer Co.*, 166 F.3d 1379, 1383 (Fed. Cir. 1999); *see also Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 168 (1939) ("While a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues.").  The mandate "is to be construed by considering the context."  *SUFI Network Servs., Inc. v. United States*, 817 F.3d 773, 780 (Fed. Cir. 2016); *see also Engel Indus.*, 166 F.3d at 1383 (instructing that "both the letter and the spirit of the mandate must be considered").

Recall that the Federal Circuit held the 1906 Act does *not* impose fiduciary duties on the Government to construct additional UIIP infrastructure or to complete the UIIP.  *Ute Indian Tribe*, 99 F.4th at 1371.  Under the Federal Circuit's decision, the Government does not have a duty to do either, so it argues this part of the first claim is barred by the mandate rule.  ECF No. 72 at 14–16.  The Government is correct.  The Tribe alleges the Government never provided it with storage.  ECF No. 65 at 15, 17, ¶¶ 46, 58–59; *id.* at 27, ¶ 4(a).  Thus, any storage for the UIIP would require additional infrastructure, and the Federal Circuit explicitly decided the 1906 Act did not impose a duty for the Government to construct the entire UIIP or additional

infrastructure. *See Ute Indian Tribe*, 99 F.4th at 1371. The Tribe's storage claim is therefore barred.[11]

The Tribe's argument to the contrary is not persuasive. It argues the Federal Circuit recognized a 1906 Act obligation to construct and complete the UIIP, which includes constructing storage. ECF No. 73 at 18. But the Tribe misreads the Federal Circuit's decision. True, the Federal Circuit recognized that "the 1906 Act obligated the United States to 'construct[ ] and complete[ ]' the 'irrigation systems,'" but it did "not read the 1906 Act as imposing any such obligation on the government as trustee." *Ute Indian Tribe*, 99 F.4th at 1371 (quoting 34 Stat. at 375). The Government's duties as trustee extend to "the facilities actually built," not the "full scope of the project initially contemplated." *Id.* Thus, the Tribe's argument conflicts with the Federal Circuit's decision.

The Tribe also contends that "providing access to storage" does not "necessarily entail[] an expansion of UIIP infrastructure" because "storage for UIIP water rights could be accomplished through the use of existing or planned storage infrastructure in the Colorado River basin that is not, itself, part of the UIIP infrastructure held in trust for the Tribe." ECF No. 73 at 19. The Tribe points to the 1965 Deferral Agreement to show that the Government could access existing storage facilities. *Id.*

This argument fails for at least three reasons. First, the Government correctly replies that this argument expands the Tribe's claim "beyond the UIIP" for the first time in its response, which it cannot do. ECF No. 76 at 4; *Davis v. United States*, 108 Fed. Cl. 331, 337 n.4 (2012) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss" (quoting *Mendez-Cardenas v. United States*, 88 Fed. Cl. 162, 166–67 (2009))).

Second, even if the Tribe properly presented this argument, it did not "identif[y] any source of law creating a trust duty to construct or utilize storage infrastructure outside of the UIIP." ECF No. 76 at 4. Without identifying a law imposing a specific fiduciary duty on the Government to use non-UIIP storage infrastructure for the UIIP, this court lacks jurisdiction to entertain such a claim under the *Navajo II* framework.

Third, to the extent the Tribe sought to argue the 1965 Deferral Agreement imposed such duties, the Federal Circuit decided that its breach of contract claim under that agreement was time-barred. *Ute Indian Tribe*, 99 F.4th at 1371–72. The court's reasoning—based on the January 1, 2005, deadline for deferral and the Tribe's knowledge "as early as 1980 . . . that the construction was not going to occur"—applies equally to the Tribe's storage claim to the extent it seeks access to facilities that were built under the 1965 Deferral Agreement. *Id.* at 1371. Thus, the mandate rule would also bar a storage claim under the 1965 Deferral Agreement.

---

[11] The Government also argues this storage claim is barred by the mandate rule to the extent the Tribe argues CUPCA or the Government's judicial admissions in the 1923 decrees support an obligation to construct additional storage. ECF No. 72 at 16–18. The Tribe does not argue that the Government's obligation to provide storage is based on those sources in its response, so the court views these points as conceded. *See Melwood Horticultural Training Ctr., Inc. v. United States*, 151 Fed. Cl. 297, 309 (2020).

2.    The Tribe adequately pleads a breach of trust claim for the Government's failure to maintain and repair the UIIP since March 8, 2012.

The Tribe next alleges a breach of trust because the Government "fail[ed] to adequately repair and maintain UIIP infrastructure and, as a result, allow[ed] the UIIP to fall into a grave state of disrepair." ECF No. 65 at 27, ¶ 4(b). The court refers to this part of the first claim as the Tribe's "maintenance and repair claim." To support this claim, the Tribe alleges that the UIIP's "grave disrepair" resulted from "several decades" of "neglect" by the Government. *Id.* at 17, ¶ 60. The Tribe mentions that a 1982 study "concluded 84% of UIIP structures needed rehabilitation," and the BIA admitted in 2008 that the UIIP had millions of dollars' worth of maintenance needs. *Id.* at 17–18, ¶¶ 60–61. It also alleges that "federal officials responsible for the administration of the UIIP failed to provide data detailing the project'[s] deferred maintenance costs" for a 2015 government study. *Id.* at 18, ¶ 62.

The Government acknowledges the Tribe's maintenance and repair claim adequately pleads a breach of duty claim under the Federal Circuit's decision, so it does not move to dismiss this claim in whole. ECF No. 72 at 30. Rather, the Government seeks to limit the scope of this claim based on (1) the statute of limitations and (2) the 2012 Settlement Agreement. *Id.* at 30–35.

> a)    *The statute of limitations bars the Tribe from recovering damages for inadequate maintenance or repair claims accruing before March 7, 2012.*

The Tribe alleges the Government failed to repair and maintain the UIIP for "several decades." ECF No. 65 at 17, ¶ 60. But this court's statute of limitations jurisdictionally bars claims filed more than "six years after such claim first accrues." 28 U.S.C. § 2501; *see John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008). And the statute "applie[s] against the claims of Indian tribes in the same manner as against any other litigant seeking legal redress or relief from the government." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576 (Fed. Cir. 1988). The Tribe filed this action on March 7, 2018, so the Government argues that the Tribe may only seek damages for maintenance and repair claims that accrued since March 7, 2012. ECF No. 72 at 30–32.

To determine when a claim accrued, this court looks to "when the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians*, 855 F.2d at 1577. Whether the events occurred to fix the government's liability "is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue." *Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995). For breach of trust claims, "the statute of limitations 'does not run against a beneficiary in favor of a trustee until the trust is repudiated and the fiduciary relationship is terminated.'" *Hopland Band of Pomo Indians*, 855 F.2d at 1578 (quoting *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F. Supp. 1238, 1249 (N.D. Cal. 1973)). Thus, if the Tribe knew or should have known about the Government's inadequate maintenance or repair before the limitations period, the Tribe may not recover damages caused by such inadequate maintenance or repair.

Here, the Tribe asserts that the continuing claim doctrine applies, allowing the Tribe to bring claims arising within the six years before it filed its complaint.  The continuing claim doctrine applies to cases when a claim is "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Brown Park Ests. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997).  In such a case, the doctrine "save[s] later arising claims even if the statute of limitations has lapsed for earlier events."  *Ariadne Fin. Servs. Pty. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998); *see Mitchell v. United States*, 10 Cl. Ct. 63, 77 (1986) (holding that the continuing claim doctrine saved claims for inadequate timber sale prices for each season's timber sales occurring in the limitations period, but not the sales from before that period).  That said, the doctrine "does not apply to a claim based on a single distinct event which has ill effects that continue to accumulate over time."  *Ariadne Fin. Servs.*, 133 F.3d at 879; *see also Brown Park Ests.*, 127 F.3d at 1456.  For instance, in *Goodeagle v. United States*, 111 Fed. Cl. 716 (2013), a breach of duty for the government's failure to "manage and supervise" certain mining operations arguably arose each day that mining activity occurred on the trust land.  *Id.* at 724.  But the continuing claim doctrine could not save any claims in *Goodeagle* as no mining occurred during this limitations period.  *Id.*

Here, both parties acknowledge that the "trust duty to maintain UIIP infrastructure [could be] viewed as a continuing duty such that 'on each day the BIA [allegedly] failed in its duty . . . there arose a new cause of action.'"  ECF No. 72 at 32; *see also* ECF No. 73 at 33.  The Tribe argues the Government breaches its maintenance and repair duties each irrigation season.  ECF No. 73 at 33.  The court agrees that the Tribe's maintenance and repair claim can be broken down into a series of breaches, each of which give rise to its own claim.

The statute of limitations thus prevents the Tribe from bringing any claims that accrued before March 7, 2012.  The Tribe raises two arguments that the statute of limitations should be tolled to some extent.  Neither holds water.

> (1)    The 2012 Settlement Agreement did not toll the statute of limitations.

The Tribe argues the 2012 Settlement Agreement preserved water rights claims that were timely when it filed its 2006 breach of trust action with an accrual date of March 8, 2012.  ECF No. 73 at 24.  Recall that the 2012 Settlement Agreement separately excepted (1) water rights claims from its waiver and (2) any claims "for harms or damages allegedly caused by [the Government] after" March 8, 2012.  ECF No. 72-7 ¶¶ 6(a)(b).  The Tribe reads these provisions to mean the 2012 Settlement Agreement preserves water rights claims that were timely when the Tribe filed its 2006 action.  ECF No. 73 at 24.  And the Tribe views its inadequate maintenance and repair claim as a water rights claim.  *Id.* at 23.  As a result, it argues the 2012 Settlement Agreement preserved any inadequate maintenance and repair claims that were timely when it filed the 2006 breach of trust action.  *Id.* at 24.  This argument fails for several reasons.

First, the Tribe's preservation argument presupposes that the Tribe's inadequate maintenance and repair claim is a water rights claim.  It is not.  Water rights under the *Winters* doctrine are "based on the necessity of water for the purpose of the federal reservation," and they extend to "only that amount of water necessary to fulfill the purpose of the reservation." *Cappaert v. United States*, 426 U.S. 128, 141–43 (1976); *see also Crow Creek Sioux Tribe v.*

*United States*, 900 F.3d 1350, 1353 (Fed. Cir. 2018) (describing the *Winters* doctrine "implied right to unappropriated water"). These rights are distinct from the Government's fiduciary duties to the Tribe related to maintaining the UIIP's infrastructure. Indeed, the Federal Circuit distinguished between the Tribe's claims for breach of duty pertaining to water infrastructure and pertaining to water rights. *Ute Indian Tribe*, 99 F.4th at 1368. The Tribe's maintenance and repair claim alleges damages *to the UIIP*, so this claim seeks water infrastructure damages—not water rights damages. Thus, the 2012 Settlement Agreement exception for water rights claims does not apply to this claim.

Second, even if this was a water rights claim, the 2012 Settlement Agreement did not affect this court's statute of limitations because it cannot be tolled by a settlement agreement. *First Annapolis Bancorp, Inc. v. United States*, 54 Fed. Cl. 529, 540 (2002) ("Because the statute of limitations is jurisdictional in this court, a tolling agreement entered into by the [parties] cannot expand the court's jurisdiction by altering the time limitations set out in 28 U.S.C. § 2501."); *Admiral Fin. Corp. v. United States*, 51 Fed. Cl. 366, 368 (2002) (similar); *see also BP Am. Prod. Co. v. United States*, 142 Fed. Cl. 446, 455 (2019) ("[T]he Tucker Act's statute of limitations is jurisdictional; it cannot be tolled by agreement."). None of the cases the Tribe relies upon change this legal conclusion. *See* ECF No 73 at 23–24. Rather, those cases describe when statutes, contracts, or common law establish the conditions precedent that must occur *before* a claim accruing. *Hopi Tribe v. United States*, 55 Fed. Cl. 81, 96 (2002) (quoting *Friedman v. United States*, 310 F.2d 381, 386 (Ct. Cl. 1962)); *Nager Elec. Co. v. United States*, 368 F.2d 847, 852 (Ct. Cl. 1966). They do not support that contracts can extend the date of accrual of a claim *after* it has accrued, i.e., tolling. The Tribe does not argue the 2012 Settlement Agreement establishes any conditions precedent to its claims' accrual, but that it alters the accrual date — tolls the agreement. *See* ECF No. 73 at 23–24. That, an agreement cannot do.

Third, even if an agreement could toll the limitations period, it did not do so here. The 2012 Settlement Agreement expressly did not "diminish or otherwise affect in any way . . . [a]ny defenses that [the Government] has or may have regarding any claims that [the Tribe] may assert in subsequent litigation." ECF No. 72-7 ¶¶ 6, 6(m); ECF No. 76 at 12. The statute of limitations is one such defense that the 2012 Settlement Agreement does not "diminish or otherwise affect."

Finally, the Tribe also argues its reading of the 2012 Settlement Agreement is the only reading that does not render the exception for water rights claims superfluous to the exception for claims caused after March 8, 2012. ECF No. 73 at 24. Not so. The exception for water rights claims allowed the Tribe to sue any time after the execution of the 2012 Settlement Agreement on *then*-timely water rights claims. That is not the same as the exception for claims accruing *after* entering the agreement. Hypothetically, if the Tribe alleged a water rights claim that accrued on March 10, 2006, the Tribe could have brought an action for such a claim on March 9, 2012, in line with the 2012 Settlement Agreement and the court's statute of limitations. Such an action would have fallen under the exception for water rights claims, but not the exception for claims accruing after March 8, 2012.

In sum, the 2012 Settlement Agreement cannot save otherwise untimely claims.

                (2)     The Indian Trust Accounting Statute does not apply to the Tribe's claims.

The Tribe also contends the statute of limitations cannot run against it because the Government has not provided an accounting as required by the Indian Trust Accounting Statute ("ITAS").  ECF No. 73 at 25–28.  But ITAS applies to claims involving trust *funds*, not trust *assets*, and does not apply to the Tribe's claims here.  ITAS provides that

> notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim . . . concerning losses to or mismanagement of trust funds, until the affected Indian tribe . . . has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

*See, e.g.*, Pub. L. No. 113-76, 128 Stat. 5, 305–06 (2014).[12]  The Federal Circuit has made clear that ITAS "must be construed strictly."  *Shoshone Indian Tribe of the Wind River Rsrv. v. United States*, 364 F.3d 1339, 1346 (Fed. Cir. 2004).  Accordingly, ITAS only tolls this court's statute of limitations for "claims concerning 'losses to . . . trust *funds*' rather than losses to . . . trust *assets*."  *Id.* at 1347, 1350; *see also Goodeagle*, 111 Fed. Cl. at 721–22.  Because the Tribe's claim concerns the mismanagement of trust assets, ITAS does not affect this court's statute of limitations.

The Tribe fairs no better with its alternative argument that the court should toll the statute of limitations based on common-law trust principles requiring an accounting to put the beneficiary on notice of the breach.  ECF No. 73 at 27–28.  To do so would run contrary to numerous decisions holding this court's statute of limitations cannot be tolled for equitable considerations, absent fraudulent or deliberate concealment by the government.  *See, e.g.*, *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008); *Hopland Band of Pomo Indians*, 855 F.2d at 1577.  Further, applying common law tolling would undermine Congress's express limitation of ITAS's tolling of statutes of limitations to claims involving trust funds rather than assets.  *See Shoshone Indian Tribe*, 364 F.3d at 1350.  Thus, the court declines the Tribe's novel approach to tolling the statute of limitations.

In the end, the statute of limitations bars any claims that accrued more than six years before the Tribe filed the complaint and the court dismisses those claims.

> b)    *The 2012 Settlement Agreement bars the Tribe from recovering for damages based on harms or violations before March 8, 2012.*

The Government also seeks to narrow the scope of the maintenance and repair claim based on the 2012 Settlement Agreement's waiver provision.  ECF No. 72 at 34.  The 2012 Settlement Agreement waives "known or unknown" claims "based on harms or violations occurring before" March 8, 2012, "that relate to the United States' management or accounting of [the Tribe's] trust funds or [the Tribe's] non-monetary trust assets or resources."  ECF No. 72-7 ¶ 4.  The waiver under the 2012 Settlement Agreement is broader than the statute of limitations because it covers known or *unknown* harms *or* violations.  *See Ute Indian Tribe*, 99 F.4th at 1373.  Thus, even if the Tribe did not know, or have reason to know, of a claim before the

---

[12] Congress annually passed ITAS from 1990 until 2015.  The above citation refers to the ITAS passed in 2014.

limitations period, the 2012 Settlement Agreement would still bar any such claim (not involving water rights) based on a violation or harm that occurred before March 8, 2012.  Given the broader scope of the 2012 Settlement Agreement, the Government argues the Tribe's maintenance and repair claim is "barred to the extent founded on alleged mismanagement occurring prior to March 8, 2012."  ECF No. 72 at 34.

The Tribe argues the 2012 Settlement Agreement does not waive any such claims because its claims are "based on water rights."  ECF No. 73 at 19–22.  For the same reasons explained *supra* Section III.A.2.a.1, the court disagrees.  The Tribe's maintenance and repair claim seeks to recover for damages to the *UIIP*; it is not a claim based on water rights.  The water rights exception to the 2012 Settlement Agreement does not apply.

The Tribe also argues that the court should apply the Indian canons of construction to broadly construe the scope of the water rights exception to the 2012 Settlement Agreement to cover claims for mismanagement of the UIIP.  ECF No. 73 at 20–22.  The Indian canons of construction provide statutes and treaties affecting the Indian tribes "should be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."  *Oneida Cty. v. Oneida Indian Nation*, 470 U.S. 226 (1985); *Jones v. Meehan*, 175 U.S. 1, 11 (1899) (similar); *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985) (applying the Indian canons of construction to statutes).  But they do not apply when the terms are unambiguous.  *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506 (1986).  Because the exception in the 2012 Settlement Agreement unambiguously applies to water rights claims, and the Tribe's maintenance and repair claim is not a water rights claim, the Indian canons of construction do not apply.  Thus, the 2012 Settlement Agreement waived the Tribe's maintenance and repair claim seeking damages to the UIIP based on harms or violations occurring before March 8, 2012.

As a result, the court grants the Government's motion insofar as it seeks dismissal of any claim based on violations or harms that occurred before March 8, 2012.

> 3.  <u>To the extent the Tribe alleges that the Government's designation of trust lands as non-assessable breached its duties, the court dismisses such a claim.</u>

The next part of Claim 1 alleges the Government "[d]esignat[ed] lands within the UIIP service area as temporarily or permanently non-assessable as a result of poor UIIP maintenance, without taking any preventative or subsequent measures to render said lands assessable and, thus, capable once more of receiving irrigation water from the UIIP."  ECF No. 65 at 27, ¶ 4(c).  The court refers to this part of the first claim as the Tribe's "non-assessable lands claim."

The Tribe contends the non-assessable designations are "directly attributable to the mismanagement of the UIIP by the [Government], including its failure to maintain and rehabilitate UIIP lands and facilities."  *Id.* at 20, ¶ 72; *see also id.* at 20, ¶ 74.  As a result of the designations, the Tribe claims it faced "a reduction of irrigated trust acreage under the UIIP, adverse economic impacts to the Tribe, and a reduction of funding available to maintain the UIIP."  *Id.* at 20, ¶ 71.

The Government moves to dismiss, arguing that the Tribe did not identify a duty that the non-assessable land designations violated.[13]  ECF No. 72 at 19.  The Tribe explains in its response that the permanently or temporarily non-assessable designations "illustrate and exemplify deficient operation and maintenance of the UIIP irrigation systems."  ECF No. 73 at 14.  It does not argue that the Government had a trust duty governing its land designations.  *Id.*  Thus, the parties appear to agree that the land designations themselves are not breaches of trust, but harm flowing from breaches of trust based on inadequate maintenance or repair.  *See* ECF No. 76 at 5.  Given that the Tribe is not bringing a separate claim asserting that the non-assessable designations themselves breached a duty, there is no part of the complaint to dismiss.[14]

### 4.    The Tribe adequately pleads a breach of trust claim for the Government's failure to use existing water quality control measures.

The Tribe also alleges in Claim 1 that the Government breached its duties under the 1906 Act by "[f]ailing to implement control measures necessary to ensure the UIIP supplies water of a sufficient quality to support crop cultivation."  ECF No. 65 at 26, ¶ 4(d).  The court refers to this part of the first claim as the Tribe's "water quality claim."  Like the Tribe's maintenance and repair claim discussed *supra* Section III.A.2, the Government understands that the Tribe's water quality claim survives dismissal in part.  ECF No. 72 at 14.  But the Government seeks to narrow the water quality claim based on the mandate rule, the statute of limitations, and the 2012 Settlement Agreement.  *Id.* at 14–18, 26, 30–32, 34.

### a)    The mandate rule.

The Tribe alleged the Government failed to take "measures to ensure that the Tribal water delivered to trust lands through the UIIP is suitable for irrigation," even though "quality control measures" were available "at the irrigation facility level."  ECF No. 65 at 20–21, ¶ 77.  Because of this breach, the Tribe suffered "economic losses" from "reduced . . . irrigability of the UIIP lands, reduced crop yields, and limited" crop variety.  *Id.* at 21, ¶ 78.

The Government argues this water quality claim "appears to rest at least in part on an allegation that there is additional infrastructure that the United States should have built as part of the UIIP."  ECF No. 72 at 15.  Because the Federal Circuit rejected the Tribe's argument that the Government had a duty to construct additional water infrastructure, the Government contends this water quality claim is barred under the mandate rule "to the extent it rests on an alleged

---

[13] The Government also argues the Settlement Agreement waived any breach of trust claim based on the non-assessable land designations.  ECF No. 72 at 34.  Because the Tribe does not seek to bring a breach of duty claim based on the non-assessable land designations, the court does not reach this argument.

[14] The Government also seeks to dismiss the non-assessable lands claim insofar as it seeks damages resulting from non-trust lands being designated non-assessable.  ECF No. 72-1.  The court addresses the Tribe's standing to bring claims on its own behalf, as *parens patriae*, and on behalf of individual tribal members *infra* Section III.D.

failure to construct new infrastructure." *Id.* at 15–18.  The Tribe did not address this argument in its response.  *See* ECF No. 76 at 3.

To the extent the Tribe alleges a breach of the Government's fiduciary duties by failing to construct *additional* water quality control measures, such a claim fails under the mandate rule. As the court discusses *supra* Section III.A.1, the Federal Circuit *explicitly* decided that the Government does not have a fiduciary duty to construct additional water infrastructure.  *Ute Indian Tribe*, 99 F.4th at 1371.  Thus, the court dismisses the water quality claim insofar as it is based on the Government's failure to construct additional infrastructure.

But it is not clear that this claim is based entirely on the Government's failure to construct anything.  The complaint can be read to allege the Government did not implement water quality control using *available* measures—not that the Government failed to build *additional* infrastructure.  Such a claim is not barred by the mandate rule.  Indeed, the Government itself recognizes that the water quality claim survives insofar as it alleges the Government breached its fiduciary duties to hold, operate, protect, and preserve the UIIP's *existing* infrastructure.  ECF No. 72 at 14.

b)      *Timeliness and waiver.*

The Government argues the statute of limitations narrows the scope of the Tribe's water quality claim.  ECF No. 72 at 30–32.  It does.  The statute of limitations applies to the Tribe's water quality claim as it applies to the Tribe's maintenance and repair claim.  *See supra* Section III.A.2.a.  Accordingly, the Tribe may not seek damages for claims that accrued before March 7, 2012, based on the Government's failure to use existing water quality control measures.

Unlike the maintenance and repair claim, the Tribe's water quality claim involves water rights.  The Tribe alleges the Government's failure to use water quality control measures reduced the water available on tribal lands for reservation purposes, i.e., irrigation.  ECF No. 65 at 21, ¶ 78.  This allegation suggests the Government did not protect the Tribe's right to receive water, so the Tribe's water quality claim implicates the Tribe's water rights.  *See Cappaert*, 426 U.S. at 141–43; *Crow Creek Sioux Tribe*, 900 F.3d at 1353.  Recall that while the 2012 Settlement Agreement waives claims based on alleged mismanagement of trust assets, it explicitly does not affect the Tribe's ability to bring water rights claims.  ECF No. 72-7 ¶ 6(b).  Thus, to the extent the water quality claim alleges damages to the Tribe's water rights, such a claim is not waived under the 2012 Settlement Agreement but may still be barred by the statute of limitations if it accrued before March 7, 2012.

In sum, the Tribe's water quality claim proceeds insofar as it alleges the Government failed to use *existing* water quality control measures, thereby damaging the Tribe's water rights, accruing within the statute of limitations.

**B.      The Tribe's second breach of trust claim survives insofar as it alleges the Government unlawfully transferred the Tribe's water rights under the 1941 Act.**

In Claim 2, the Tribe alleges the Government repudiated its trust responsibilities and role as trustee.  ECF No. 65 at 28, ¶ 13.  The Government allegedly breached its trust duties of "undivided loyalty to its trust beneficiary, and . . . dispos[al] of trust corpus in the best interest of

the beneficiary." *Id.* at 29, ¶ 14.  The Tribe provides four examples of the Government's alleged breach of trust by repudiation.  *Id.* at 28–29, ¶ 13.

Unlike its position on Claim 1, the Government moves to dismiss the entirety of Claim 2. ECF No. 72 at 12.  Consistent with the court's approach above, the court addresses each alleged breach of trust by repudiation in Claim 2.[15]

> 1.  <u>The Tribe adequately pleads its breach of trust claim pertaining to unlawful water rights transfers under the 1941 Act.</u>

The Tribe alleges the Government "[u]nlawfully transferr[ed] federally decreed Tribal water rights to non-Tribal lands under the color of the [1941 Act], without consulting with or compensating the Tribe."[16]  The court refers to this claim as the Tribe's "1941 Act water rights transfer claim."  ECF No. 65 at 28, ¶ 13(a).  The Government argues for dismissal under RCFC 12(b)(6) for failure to state a claim or, as time-barred.  ECF No. 72 at 23–24, 28–29.

Recall that the 1941 Act authorized the Secretary "to transfer water rights, with the consent of the interested parties, to other lands under [the UIIP] and to make necessary contracts to effectuate such transfers."  Pub. L. No. 77-83, § 2, ch. 142, 55 Stat. 209.  The Tribe alleges the Secretary "transferred Tribal water rights from about 10,000 acres of trust lands to other non-Indian lands" without the Tribe's knowledge.  ECF No. 65 at 21, ¶¶ 81–82.

The Government contends that the Tribe fails to state a claim because "[t]he Tribe's vague allegations do not identify any particular water right transfer for which the Tribe was an interested party but did not consent and therefore do not adequately plead a claim for relief." ECF No. 72 at 23.  As the Government emphasizes, the Tribe is not necessarily an interested party in all water right transfers because the scope of the 1941 Act covers transfers between non-Indian lands.  ECF No. 76 at 7.  But the Government does not point to any rule or requirement for the Tribe to plead with such specificity.  Indeed, RCFC 8 only requires the Tribe to provide notice of its claims in the complaint, which the Tribe does.  The Tribe alleges the Secretary transferred "Tribal water rights *from . . . trust lands* to other non-Indian lands."  ECF No. 65 at 21, ¶ 82 (emphasis added).  The Tribe is an interested party to a water right transfer of tribal water from tribal trust lands to non-tribal lands.  Thus, the Tribe is an interested party in the water right transfers it alleges in its complaint.  And the Tribe alleges these transfers occurred without the Tribe's knowledge.  *Id.* at 21, ¶ 81.  The Tribe's lack of knowledge of the transfers, which the court assumes to be true at this stage, indicates it did not consent to such transfers.

---

[15] Like the first claim, the Tribe argues the court should review its second claim in whole and the Federal Circuit's recognition of fiduciary duties under the 1906 Act precludes dismissal under Rule 12(b)(1).  ECF No. 73 at 12–14.  Those arguments fail for the same reasons explained *supra* Section III.A.

[16] The Tribe also alleges this claim extends to failure to consult with or compensate "Indian landowners."  ECF No. 65 at 28, ¶ 13(a).  The court addresses whether the Tribe can bring claims on behalf of individual tribal members *infra* Section III.D.

Thus, the Tribe's water right transfers claim does not suffer from the pleading deficiencies that the Government asserts.

In the alternative, the Government argues that the water right transfers claim is time-barred and the court lacks jurisdiction under 28 U.S.C. § 2501. ECF No. 72 at 28–29. According to the Government, all the water right transfers occurred long before the limitations period. *Id.* That may be true, but that is a fact that is not presently before the court. The parties also disagree on whether the Tribe had actual or constructive knowledge of those transfers before March 7, 2012, six years before the Tribe filed its complaint on March 7, 2018. If the Tribe did have knowledge, the transfers before that date would be time-barred. *Id.* But the Tribe alleges it did not have actual or constructive knowledge as it only learned of the challenged transfers in a September 2012 disclosure "that part of the [Government's] breach of trust included transferring federally decreed Tribal water rights to non-Tribal lands (as alleged in its Second Claim for Relief at ¶ 13)."[17] *Id.* at 30; *see also id.* at 28–29, 31.

But the Government points to certain correspondence from the Tribe to the Government in 1962 about the 1941 Act transfers as showing actual knowledge of all transfers. ECF No. 72 at 28; ECF No. 72-8. That letter, however, merely asks about the effects of and details pertaining to any transfers that may take place under the 1941 Act. ECF No. 72-8. It does not demonstrate actual knowledge of all the transfers or even indicate that there have been no subsequent transfers.

As for constructive knowledge, the Tribe argues it did not need to look into any water right transfers before it received actual knowledge of the transfers in 2012 because it does not need to supervise the Government's "day-to-day . . . management of the UIIP" as the trust beneficiary. ECF No. 73 at 31 n.6 (citing *Mitchell*, 463 U.S. at 227). While the Tribe may not need to monitor the day-to-day operations of the trust, it cannot delay bringing its claim if reasonable diligence would have uncovered the allegedly improper transfers.

Based on the record before the court, the court cannot determine what the Tribe knew or should have known, and at what time. The Tribe has alleged facts sufficient to satisfy the court (at this stage) that there are 1941 Act claims within the court's statute of limitations. That said, the parties should develop the facts surrounding the Tribe's knowledge in discovery. If the Government develops a record that it believes establishes the Tribe's actual or constructive knowledge of these claims before March 7, 2012, it may move to dismiss then. *See* RCFC 12(h)(3).

### 2. The Tribe's non-assessable lands claim does not survive as a repudiation of trust claim.

The Tribe's second claim also alleges the Government repudiated its trust duties by "[d]esignating a disproportionate quantity of Tribal . . . land within the UIIP service area as non-

---

[17] In the Tribe's complaint, it alleges it became aware of the water right transfers in 2013. ECF No. 65 at 21, ¶ 81. Because both September 2012 and any date in 2013 fall within the limitations period, the court need not decide which date is the proper date for accrual.

assessable . . . without taking any meaningful action to render these lands assessable."[18]  ECF No. 65 at 29, ¶ 13(c).  This part of the second claim largely overlaps with the Tribe's non-assessable lands claim discussed *supra* Section III.A.3.

As the court explains *supra* Section III.A.3, the Tribe does not argue the non-assessable land designations themselves breached the Government's duties, but points to these land designations to support its damages from other breaches of trust.  ECF No. 73 at 14.  Thus, the Tribe concedes this part of the second claim does not state a standalone breach of trust by repudiation claim.  To the extent the Tribe sought to state a standalone claim for repudiation of trust based on the non-assessable land designations, such a claim is dismissed for failure to identify a trust duty, as time-barred, and to the extent it affected trust assets before March 8, 2012, under the 2012 Settlement Agreement.  *See supra* Section III.A.3.

### 3.    The court must dismiss the Tribe's claim insofar as it alleges the Government repudiates its duties by entering carriage agreements.

The last part of the Tribe's second claim alleges the Government repudiated its trust duties by "[e]ntering into carriage agreements allowing non-Indians to use UIIP infrastructure to transport and receive their water rights without consent or consultation from the Tribe, resulting in additional wear and tear to [the] UIIP with no concomitant benefit to the Tribe or its members."  ECF No. 65 at 29, ¶ 13(d).  The court refers to this claim as the Tribe's "carriage agreements claim."  The Government moves to dismiss the carriage agreements claim on jurisdictional grounds—for failure to identify a trust duty and as time-barred—and as waived under the 2012 Settlement Agreement.  ECF No. 72 at 18–19, 27–28, 34.

The Tribe alleges the Government "frequently enters carriage agreements, under which the [Government] agrees to use UIIP infrastructure to deliver non-tribal water to non-Indian water users" without consulting with the Tribe.  ECF No. 65 at 25, ¶¶ 98, 100.  As a result of these carriage agreements, the UIIP allegedly has suffered "significant additional deterioration . . . with no accompanying benefit to the Tribe or its members."  *Id.* at 25, ¶ 99.  These carriage agreements allegedly breach the Government's duty "of undivided loyalty to its trust beneficiary" and its duty "to dispose of trust corpus in the best interest of the beneficiary."  *Id.* at 29, ¶ 14.

The Government argues the Tribe did not identify a duty that the carriage agreements violate.  ECF No. 72 at 18–19.  The Tribe responds that it "is not asserting a blanket statutory prohibition on carriage agreements."  ECF No. 73 at 14.  Thus, the parties appear to agree that the Government does not have a fiduciary duty *not* to enter carriage agreements.  And that agreement is consistent with the Federal Circuit's holding that "third-party use [of the UIIP] is not inconsistent with the obligation to protect and preserve the property," *Ute Indian Tribe*, 99 F.4th at 1370, and the text of the 1906 Act that permits the use of the UIIP "for the purpose of conveying water by any person, association, or corporation," Pub. L. No. 59-258, 34 Stat. at 375.

---

[18] The Tribe also alleges this claim extends to designation of "Indian-owned land" as non-assessable.  ECF No. 65 at 28, ¶ 13(c).  The court addresses whether the Tribe can bring claims on behalf of individual tribal members *infra* Section III.D.

Rather, the Tribe contends that "the manner by which the [Government] enters carriage agreements with non-Indian water users to use UIIP infrastructure, *i.e.,* with no consultation or input from the Tribe and no measures to mitigate wear and tear on UIIP infrastructure, constitutes a repudiation of the [Government's] trust duties." ECF No. 73 at 14. The Government replies that "the alleged resulting wear and tear and supposed failure to maintain UIIP infrastructure, separate from entrance into the carriage agreement, would be the alleged breach falling within" the scope of fiduciary duties recognized by the Federal Circuit. ECF No. 76 at 4–5. The court agrees.

By the Tribe's own argument, it is not challenging the Government's authority to enter carriage agreements, but it seeks damages for the effects of those carriage agreements on the maintenance and repair of the UIIP. Those are the same damages sought by the Tribe's maintenance and repair claim discussed *supra* Section III.A.2. To the extent the carriage of water to non-Indian water users requires additional maintenance and repair of the UIIP, and to the extent the Government has failed to perform such maintenance and repair, the Tribe may prove those facts in support of its maintenance and repair claim. It does not give rise to a standalone repudiation of trust claim based on the carriage agreements themselves.[19]

The court notes the carriage agreements and their corresponding need for additional maintenance and repair of the UIIP may not give rise to recoverable damages under the Tribe's maintenance and repair claim if they run afoul of the statute of limitations or 2012 Settlement Agreement. The Tribe alleges the Government "has failed to renegotiate these carriage agreements for decades." ECF No. 65 at 25, ¶ 101. The Government agrees that the carriage agreements are "several decades old," and thus contends that any claim challenging them is time-barred or waived by the 2012 Settlement Agreement. ECF No. 72 at 27, 34. The need for additional maintenance and repair to the UIIP based on the Government's carriage agreements likely accrued relatively soon after the Government entered into those agreements. But even if the Tribe did not know about the carriage agreements, the 2012 Settlement Agreement waives claims for violations or harms (i.e. damages to trust assets, including the UIIP) occurring before the agreement. *See supra* Section III.A.2.b. Thus, regardless of the statute of limitations, the 2012 Settlement Agreement precludes any claim that the carriage agreements based on events before the agreement was signed on March 8, 2012.

### C.    The Tribe's claims pertaining to the Midview Exchange Agreement are dismissed.

---

[19] The Tribe's complaint also alleges the Government uses "informal operating practices" to "allow[] non-Indians to utilize UIIP water and infrastructure" without a formal agreement like the carriage agreements. ECF No. 65 at 25–26, ¶¶ 102–04. Because the 1906 Act permits the use of the UIIP "by any person," these informal operating practices do not appear to be contrary to law, nor does the Tribe argue they are. To the extent the Tribe sought to argue these informal operating practices also create a need for additional maintenance and repair of the UIIP, such a standalone repudiation of trust claim fails for the same reasons the Tribe's carriage agreements claim fails. The Tribe may point to these informal operating practices and the Government's failure to adequately maintain and repair the UIIP after engaging in these practices to help prove its damages for its surviving maintenance and repair claim discussed *supra* Section III.A.2.

The Tribe alleges that various Government actions related to the Midview Exchange Agreement amount to either a breach of trust or a breach of contract. In particular, it alleges the Government (1) breached its trust duties by transferring water rights under the agreement, ECF No. 65 at 27, ¶ 4(e); (2) repudiated its trust duties by entering, implementing, and continuing to uphold the agreement, as well as refusing to administer certain property as part of the UIIP, *id.* at 28–29, ¶ 13(b); and (3) breached the contract by failing to transfer the Midview Property into trust, *id.* at 30, ¶ 19. The court refers to these claims collectively as the Tribe's "Midview claims." As explained below, the Midview claims are dismissed as time-barred, as violative of the mandate rule, or for failure to state a claim under RCFC 12(b)(6).

      1.    <u>The Tribe's breach of trust claims based the Government's entrance into, or the terms set by, the Midview Exchange Agreement are time-barred.</u>

The Tribe claims that the Government breached its trust duties through "the unlawful Secretarial transfers of project water rights. . . related to the Midview Exchange Agreements." *Id.* at 27, ¶ 4(e). Similarly, the Tribe claims that the Government repudiated its trust duties by "[e]ntering, implementing, and continuing to uphold the Midview Exchange Agreement." *Id.* at 28.

Any claims based on the Government's entry into the Midview Exchange Agreement, or the terms of that agreement, accrued when the parties signed the agreement in 1967. As a signatory to the Midview Exchange Agreement, the Tribe had actual knowledge of the Government's entrance into the agreement, as well as the water rights transferred thereunder, at the time of its execution. As the court explains *supra* Section III.A.2.a, this court's statute of limitations bars claims that accrued over six years before the filing of an action. 28 U.S.C. § 2501. These claims are therefore dismissed insofar as they allege that the Government's entering into the Midview Exchange Agreement or the terms of the agreement breached any fiduciary duty.

      2.    <u>The Tribe's breach of trust claim involving the administration of the Midview Reservoir is barred by the mandate rule.</u>

The Tribe's next Midview claim alleges that the Government repudiated its trust duties by "refusing to administer the Midview Reservoir as part of the UIIP as the agreement contemplates." ECF No. 65 at 28–29, ¶ 13(b). But this is not the Tribe's first bite at this apple.

In the original action, the Tribe claimed that the Government breached the contract by "failing to effectuate the transfer of the Midview Property in trust for the benefit of the UIIP." *Ute Indian Tribe*, No. 18-359 L, 2021 WL 1602876, at *8 (Fed. Cl. Feb. 12, 2021); ECF No. 18 at 73. The Tribe argued on appeal that this claim was not limited by the 2012 Settlement Agreement "because the Midview Property never became a trust asset." *Ute Indian Tribe*, 99 F.4th at 1373. The Federal Circuit squarely rejected this argument:

> We reject the Tribe's theory. We read the settlement agreement as covering both assets that were in trust and assets that should have been transferred in trust. To the extent that [the claim] concerned infrastructure, we think that a claim that such infrastructure was

> mismanaged is a claim that "relate[s] to the United States' management" of that purported trust asset (i.e., a non-monetary trust asset), and claims "based on harms or violations occurring before the date of the execution of [the 2012] Settlement Agreement," which was March 8, 2012, are barred. We affirm the dismissal of [the claim] insofar as it concerned infrastructure.

*Id.* It is thus settled at this stage that, in signing the 2012 Settlement Agreement, the Tribe waived any claims related to the Government's handling of trust assets under the Midview Exchange Agreement. And the Federal Circuit held that this waiver extends to "assets that were in trust and assets that should have been transferred in trust." *Id.*

Here, the Tribe's claim that the Government "refus[ed] to administer the Midview Reservoir as part of the UIIP" is materially indistinguishable from its previous claim that the Government "fail[ed] to effectuate the transfer of the Midview Property in trust for the benefit of the UIIP." *See* ECF No. 65 at 28–29, ¶ 13(b); *see also Ute Indian Tribe*, No. 18-359 L, 2021 WL 1602876, at *8 (Fed. Cl. Feb. 12, 2021); *see also* ECF No. 18 at 73. Both claims relate to the Government's management of an asset that the Tribe alleges "should have been transferred into trust." *Id.* The circuit affirmed the dismissal of this claim as waived by the 2012 Settlement Agreement. Because this court cannot reconsider "issues implicitly or explicitly decided on appeal," *TecSec, Inc.*, 731 F.3d at 1341–42, these claims are dismissed.

### 3.    The breach of contract claim is dismissed under RCFC 12(b)(6) for failure to state a claim.

The Tribe's final Midview claim is for breach of contract. The Federal Circuit left the parties with specific guidance on this issue. After affirming the dismissal of the prior Midview breach of contract claim "insofar as it concerned trust assets," the Federal Circuit noted that there was an open question as to *water rights*. *Ute Indian Tribe*, 99 F.4th at 1373. It remanded for further consideration of three discrete issues: "(1) whether there are water rights under the Midview Exchange Agreement, (2) whether the complaint adequately pled a breach of contract with respect to water rights, and (3) whether the exception in the 2012 settlement applies." *Id.* at 1373–74.

As to the first question, the record sufficiently establishes that the Midview Exchange Agreement involved the transfer of water rights. The agreement expressly provides for the exchange of both water infrastructure (i.e., the Midview Property) and water rights between Reclamation and Indian Affairs. *See* ECF No. 72-5. As to the latter category, Reclamation received a "specific portion of the water and water rights in Lake Fork River" for the benefit of the Moon Lake Project. *Id.* at 2, ¶ 6. And Indian Affairs received certain "water and water rights in Duchesne River" for the benefit of the UIIP. *Id.* at 3, ¶ 7.

But the Tribe does not adequately plead breach of contract with respect to *water rights* under the Midview Exchange Agreement. In the operative complaint, the only apparent reference to a breach of contract involving such water rights is the allegation that "the BIA is now using water from the Midview Reservoir to irrigate lands other than those designated for irrigation under the Agreement." ECF No. 65 at 24, ¶ 96. Indeed, the Tribe's discussion on this

point focuses almost exclusively on the Government's alleged failure to transfer the Midview Property into trust, *see id.* at 22–24, which is a claim already foreclosed by the Federal Circuit. *See Ute Indian Tribe*, 99 F.4th at 1373. And beyond merely neglecting to provide factual support, the Tribe disclaims such a water rights claim altogether in its response:

> The United States also asserts that "the Tribe has not alleged the factual predicate necessary to find that the United States is administering water rights in a way inconsistent with the terms of the Exchange Agreement." *But this issue has no bearing on the Tribe's claim*, which is that "[t]he United States has breached the Midview Exchange by non-performance in failing to effectuate a transfer of the Midview Property in trust, and as a component part of the UIIP irrigation system, for the benefit of the Tribe."

ECF No. 73 at 33–34 (emphasis added) (internal citations omitted). The Tribe thus did away with the only potentially viable Midview claim it had left on remand. It follows that the Tribe has not adequately pled breach of contract under the Midview Exchange Agreement. *See* RCFC 12(b)(6). Because this claim fails under RCFC 12(b)(6), the court does not reach the question of whether a breach of contract claim for such water rights would be waived, limited, or proscribed by the 2012 Settlement Agreement, the statute of limitations, or on other jurisdictional grounds. To the extent the Tribe wishes to assert a breach of the kind the Federal Circuit left open, it may move for leave to amend its complaint to add such a claim.

### D.    The Tribe's surviving claims may only proceed to the extent the Tribe itself suffered damages.

The Government also moves to dismiss any part of the above claims insofar as they are brought on behalf of any party other than the Tribe. ECF No. 72 at 35–38.

First, the Government asks the court to dismiss any claims brought on behalf of individual tribal members. *Id.* at 35–36. The Tribe responds that it does not seek "compensation for damage to individual Tribal member property rights." ECF No. 73 at 34. Thus, there is nothing to dismiss here.

Second, the Government argues the Tribe cannot bring any claims for damages to the Tribe based on *parens patriae* standing. ECF No. 72 at 35–38. The Government is correct. The Supreme Court has held that "[a] [s]tate does not have standard as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) (citations omitted); *see also Haaland v. Brackeen*, 599 U.S. 255, 294–95 (2023) (quoting *Alfred L. Snapp & Son*, 458 U.S. at 610 n.16). This prohibition also applies to tribes seeking to assert *parens patriae* standing in claims against the federal government. *N. Paiute Nation v. United States*, 10 Cl. Ct. 401, 406–07 (1986). Tribes may assert claims against the Government only "for . . . wrong[s] done to the Tribe *qua* Tribe."

*Id.* at 408.  Thus, the Tribe may not assert *parens patriae* standing in this action against the Government.[20]

The Tribe further argues it can bring claims based on *parens patriae* standing because damages for individual landowners' "agricultural losses" harm the Tribe's quasi-sovereign interests, specifically "the Tribal economy as a whole and the ability of the Tribe to sustain a viable homeland on its Reservation."  ECF No. 73 at 34; *see also* ECF No. 65 at 2–3, ¶ 2.  Whether such damages are quasi-sovereign interests sufficient to support *parens patriae* standing is no matter because the Tribe cannot assert such standing against the Government.

As the court explains *supra* Sections III.A–III.C, the claims surviving the motion for partial dismissal are the maintenance and repair claim, the water quality control claim, and the 1941 Act water rights transfer claim.  Because the Tribe cannot assert *parens patriae* standing for these claims, it may seek any damages caused by the Government's alleged breach of duty solely to the extent those damages harmed the Tribe as the Tribe.  The Tribe explains damages for "[t]he harms suffered from the [Government's] mismanagement of the UIIP [are] harms to the Tribe as a whole" because "the UIIP is a Tribal asset," and the Government's "mismanagement of the UIIP irrigation systems results in loss and waste of <u>Tribal</u> water."  ECF No. 73 at 34 (emphasis in original).  The court will leave it to the Tribe in discovery to prove it suffered harms from the Government's alleged breaches of trust.

## IV.    Conclusion

For these reasons, the court grants-in-part and denies-in-part the Government's motion to partially dismiss the complaint, ECF No. 72.  Count 1—breach of trust—survives insofar as it alleges damages to the Tribe caused by the Government (1) failing to adequately maintain and repair the UIIP and (2) failing to utilize existing water quality control measures, and to the extent such claims accrued within the limitations period and are not otherwise barred by the 2012 Settlement Agreement.  Count 2 survives to the extent it turns on the Secretary's water rights transfers under the 1941 Act.  The rest of the Tribe's claims are dismissed.

It is so ORDERED.

<u>s/ Edward H. Meyers</u>
Edward H. Meyers
Judge

---

[20] Because the court decides the Tribe cannot bring claims in its *parens patriae* authority, it does not reach the Government's arguments limiting the scope of the Tribe's *parens patriae* authority. *See* ECF No. 72 at 37.